Filed 3/5/21  P. v. Price CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARCEL DESEAN PRICE,<br><br>    Defendant and Appellant. | D076731<br><br><br>(Super. Ct. No. SCD277378) |

APPEAL from a judgment of the Superior Court of San Diego County, David M. Gill, Judge.  Affirmed and remanded with directions.

Nancy Olsen, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters and Julie L. Garland, Senior Assistant Attorneys General, Michael Pulos and Seth M. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Marcel Desean Price of premeditated attempted murder (Pen. Code,[1] §§ 664, 187, subd. (a), 189; counts 1-3), assault with a firearm (§ 245, subd. (a)(2); counts 4-6), and possession of a firearm by a felon (§ 29800, subd. (a)(1); count 7). It found true allegations that as to counts 1 and 4 Price personally inflicted great bodily injury on the victim (§ 12022.7, subd. (a)); as to all counts that he personally used a firearm within the meaning of section 12022.5, subdivision (a); and as to counts 1 through 3 he personally and intentionally used a firearm within the meaning of section 12022.53, subdivision (b), intentionally and personally discharged a firearm (§ 12022.53, subd. (c)), and did so causing great bodily injury to a person other than an accomplice (§ 12022.53, subd. (d)). Price admitted allegations that he committed the offenses while on felony probation (§ 1203, subd. (k)). The court sentenced him to an indeterminate term of 96 years to life in prison, and imposed various fines, fees and assessments.[2]

Price contends the trial court prejudicially erred by (1) admitting irrelevant gang evidence, which violated his due process rights and rendered the trial fundamentally unfair; (2) permitting a detective to testify based on surveillance videos that Price was the shooter; and (3) permitting the prosecutor to elicit testimony from a witness about his fear of testifying due

[1] Undesignated statutory references are to the Penal Code. The court declared a mistrial as to Price's co-defendant, Michael Hune, after the jury hung on charges against Hune.

[2] Specifically, Price's sentence consists of seven years to life on counts 1 through 3, plus 25 years to life on each of those counts for the firearm enhancement under section 12022.53, subdivision (d); the upper four-year term on each of counts 4 through 6, stayed pursuant to section 654; and the upper term of three years on count 7 stayed pursuant to section 654. The court imposed but stayed under section 654 sentences on all remaining enhancements.

to the defendants' gang membership. Price contends his counsel was prejudicially ineffective if he forfeited either or both of the latter two contentions. Price further contends the fines, fees and assessments must be vacated because they violated his federal and state due process or equal protection rights, and were cruel and/or unusual, without a finding he had the ability to pay them. Price further contends the required sentence for his attempted premeditated murder convictions in counts 1 through 3 is life with the possibility of parole, not seven years to life. He maintains the combined errors require reversal of the judgment.

The People concede we should correct Price's sentence on the attempted murder convictions without remand. We agree the proper sentence on counts 1 through 3 is life with the possibility of parole and direct the court to correct the abstract of judgment accordingly. Otherwise, we reject Price's contentions and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Price does not challenge the sufficiency of the evidence of his underlying convictions, so we summarize the underlying facts as necessary to address questions of prejudice.

During the night of June 8, 2018, and the early morning hours of June 9, 2018, Price, a Skyline (also known as East Side) Piru gang member, and three other men, two of whom were associated with the O'Farrell Park gang, were at a North Park bar drinking and socializing when Price and one of his companions, Ted Mercer, got into an altercation and fight with others. Mercer was associated with the O'Farrell Park gang. A security guard heard Mercer say, "Fuck you and Fuck East Side," before the initial punch. Afterwards, Mercer yelled that they had gotten "maxed out," meaning they got beat up or lost the fight. He was injured and angry, feeling that the

3

bouncers had thrown him back into the fight. When the fight was over, security guards would not let Price or Mercer back into the bar. When Price and Mercer tried to reenter, two of the guards grabbed Price and tried to flip him over a railing. Mercer slapped one of the guards and the guard responded by punching him a few times in the face. Price and Mercer finally left the bar with their group, angry about what had happened there. While in the car driving away from the bar, Mercer exchanged calls with Hune using the phone of a friend who was at the bar that night.

At about 2:50 a.m., two of the security guards were standing outside the bar when they heard gunshots. One of the guards was shot in the upper chest area. Witnesses hearing the gunshots saw a black Chrysler 300, later determined to be registered to Hune, speeding down an adjacent street. One witness saw an individual run into the car after the gunshots and described him as an African-American male, five feet nine inches to six feet one inch tall, with a medium build on the slender side, wearing baggy clothes and a dark sweatshirt with a hood over his head.[3] The man appeared to be shoving something inside his waistband.

San Diego Police Department Detective Andrew Tafoya was assigned to the matter. He contacted the bar's manager and sought out surveillance video from surrounding businesses. He identified the men in the bar video by asking a gang unit detective if she recognized the men from the bar that night, and from that he was able to identify Price and Jordan Bingham. Detective Tafoya also viewed surveillance footage from the bar on June 8 showing Price and his colleagues entering the bar and the fight that ensued. The video showed the clothing and shoes Price was wearing that night.

---

[3]    Price fit this description, as he is six feet one inch tall and weighed 165 pounds around the time of his sentencing.

Detective Tafoya obtained surveillance footage from other local businesses that showed a black Chrysler 300 pull up and a male exit the car and commit the shooting, which occurred around 2:52 a.m.  The video showed the vehicle pull up at 2:51 a.m. and a man exit the passenger side within 10 seconds.  It also showed the first six numbers of the car's license plate, leading to records establishing that the car was Hune's.  Detective Tafoya compared still photographs of the surveillance footage from the bar with the other business, and testified based on the similarities in clothing and shoe markings, as well as Price's height, stature and gait, that he believed the male who exited the Chrysler 300 was Price.[4]  The detective also obtained a photograph from Jordan Bingham's Facebook page showing Bingham and Price together on June 8, throwing what appeared to be gang signs.

Officers arrested Price about 12 days after the shooting.  In a jail telephone call later that month, Price told the call recipient, "I'm done."  Though he said he "didn't do nothing," he also said he had "fucked up" and was "fucked right now . . . but it's my fault.  The only person I'm mad at is me.  I'm not upset with nobody else but myself."  The Chrysler 300 was later located in the Rancho Cucamonga area.

---

[4]      The detective testified about Price's clothing depicted in the bar footage:  "[A]round the waist area going down appearing [*sic*] to be an identical match to the pants and shoes that are seen on the video from [the neighboring business].  Just the bulkiness of the pants around the thigh area and then it comes down and slims down some and then kind of goes straight down.  And the shoes, the description of the shoes being an Adidas shoe, like a mesh material almost with, like, a plastic three stripe for the Adidas logo on the sides."  When asked what he noticed when he compared the two portions of video, he said:  "Just the bagginess or lack thereof around the leg area, the thigh.  It appeared to be similar.  It wasn't a baggie, it wasn't a super-tight fit.  And then as you come down the leg, again, it's more like a fitted look than a baggie or skinny jeans.  And then as you keep going down, just the way the pants sit on the shoe and then the actual shoe itself."

# I. *Admission of Expert Gang Evidence*

## A. *Background*

Before trial, when the case was proceeding against both Price and Hune, the People moved to admit evidence of Price's and Hune's gang affiliations and gang culture—specifically, among other things, the significance of June 8 as a day of celebration and the importance of respect—to prove motive, Price and Hune's shared intent, and knowledge. They argued that while motive was not an element of any crime, the gang evidence could be admitted as relevant to that issue and others such as identity and modus operandi. They also argued gang affiliation could be relevant to proving the codefendants' relationship with one another and their involvement in the charged crime. The People argued that the evidence was relevant to help explain why the defendants would react so violently to a "seemingly innocuous situation at a bar"; that in the present case, "there is no other explanation for the crime but the fact that Price felt the need to retaliate and intimidate the security guards due to his affiliations and the culture of gang criminal behavior." Price moved to exclude the evidence on grounds its probative value, if any, was outweighed by its prejudicial effect.

At arguments on the motions, Price's counsel objected to admission of testimony concerning Price's documented gang member status, arguing Price was not provided due process as the documentation oftentimes is done without a person's knowledge. Counsel pointed out there was no gang connection to the victims, the location or why the incident started; that the occurrence was completely unrelated to any gang activity. He argued that the reference to June 8 "would be to paint the picture of a day of mayhem or just a lawless day," and unfairly depicted his client as a "monster" on that day. He argued Facebook posts showing his client throwing gang signs shed

an unfairly prejudicial light on Price.  The People acknowledged they did not allege a section 186.22 gang allegation because no gang rivals were involved.  The prosecutor argued, however, that "the gang mentality, the gang connection, that association and that sense of needing to ban together to retaliate in obligation to one another is what makes it relevant."  She argued it was evidence that "helps to explain really the unexplainable" to the jury.

The court granted the motion, finding the gang evidence had "some significant probative value" on motive and intent that was not outweighed by its prejudicial effect in misleading or confusing the jury, or prolonging the trial.  In response to further argument from codefendant Hune's counsel, the court explained it would not permit the expert to opine that on the particular day Hune had a certain intent or motive, but it was proper for the expert to testify that the gang allegiance meant individuals had a sense of obligation to help fellow gang members or associates under certain circumstances.

At trial, San Diego Police Department Detective Joseph Castillo, a gang detective responsible for monitoring the East Side/Skyline Piru and O'Farrell Park Banksters street gangs, testified about the Skyline and O'Farrell Park gangs' history and territory, as well as the importance of respect and loyalty in the gang culture.  Detective Castillo testified that the two gangs were allies: the same gang with different boundaries.  He explained that based on the significance of the numbers 6 and 8, June 8 was a Skyline and O'Farrell Park gang "holiday" on which the members would have parties or barbeques.  Detective Castillo testified that in June 2018, Price was a Skyline gang member going by the moniker Baby AB.  The detective identified Price and others, including Jordan Bingham, in photographs throwing gang signs.  Detective Castillo testified that Hune was known to be an O'Farrell Park gang associate going by the moniker YG Boolin or Boolin YG.  The detective

7

recalled that in October 2017, he and his partner had seen Hune driving a black Chrysler 300.

The prosecutor gave Detective Castillo a hypothetical, asking him if a Skyline gang member would feel disrespected if he were at a bar and got into a fight but was on the losing end, and then was beaten up and physically ejected by security guards. The detective responded that "[w]ithout a doubt" he would feel disrespected and would be expected to do something as a gang member to retaliate or else be chastised as a "buster"—a gang member unwilling to commit crimes. When asked whether an accompanying gang member who ran away when his colleague got beat up by security guards would have a bigger concern about respect among his gang members, Detective Castillo testified that he also would be expected to retaliate. The disrespect would be more intensified if the incident occurred on the gang "holiday." The detective also agreed that if an O'Farrell Park gang associate was getting beaten up and was accompanied by a Skyline gang member, the Skyline gang member would be expected to back him up, or also get involved in the fight. If the gang member ran away from the fight, he could be in a position of getting beat up by the gang or worse, for not helping out.

Detective Castillo was asked about his experience investigating drive-by shootings, and testified that at times gang members in a car participating in a shooting took individuals along who were unaware of what was going to happen. He explained the others in the car would be expected to take a role, such as the driver, shooter, or look-out. He agreed that a gang member who had been a snitch might need to prove himself by committing a serious crime, including by driving other gang members to a location.

In closing arguments, the prosecutor explained that the defendants had a particular mentality that caused them to retaliate against the guards:

8

"People get kicked out of bars every weekend, probably every day in this city, but they don't return to that bar and open fire on the security guards who have ejected them. It takes a person with a particular mentality to choose that response, a person who comes from a world where retaliation is the type of response that's warranted in that circumstance, a world and a mentality that is shared by these two defendants, a world where the retaliation in the form of returning to that bar and opening fire is not only the expected response, it's the revered response." She explained that motive was "huge" and could be explained by the fact that defendants were on the losing end of the fight, got "pummel[ed]" and manhandled by the guards, and it occurred on their gang celebration day. The prosecutor argued she established defendants committed the crimes not only with evidence of their "shared mentality," but also other direct and circumstantial evidence: the video surveillance evidence and the timeline of events, partly established by the cell phone activity after the fight.

As to the evidence of "gang activity," the court gave the jury instructions that it could consider the evidence on the defendants' intent to kill or Hune's intent to aid Price, their motive to commit the offense, and Hune's knowledge that Price intended to commit the crime. It instructed that the evidence could be considered "when you evaluate the credibility or believability of a witness . . . ." The instruction reads: "You may not consider this evidence for any other purpose" or "conclude from [it] that the defendant is a person of bad character or that he has a disposition to commit crime."[5]

---

[5] The jury instruction, CALCRIM No. 1403, has a stamp on its face indicating it was "given." But the court did not read every jury instruction to the jury; it told jurors it would "cover a few of the instructions and a concluding instruction" and then gave jurors a complete set of written instructions for their deliberations.

B. *Legal Principles and Standard of Review*

Under California law, all relevant evidence is admissible except as otherwise provided by statute. (Evid. Code, § 351.) Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

" 'Gang evidence is admissible if it is logically relevant to some material issue in the case other than character evidence, is not more prejudicial than probative, and is not cumulative. [Citations.] . . . [¶] However, gang evidence is inadmissible if introduced only to "show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense." ' " (*People v. Coneal* (2019) 41 Cal.App.5th 951, 964.) In *People v. Franklin* (2016) 248 Cal.App.4th 938, the court explained that " '[e]vidence related to gang membership is not insulated from the general rule that all relevant evidence is admissible if it is relevant to a material issue in the case other than character, is not more prejudicial than probative, and is not cumulative.' [Citations.] Indeed, gang evidence is 'relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related.' [Citation.] ' "[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." ' " (*People v. Franklin*, at p. 953; see also *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167-1168; *People v. Albarran* (2007) 149 Cal.App.4th 214, 223 ["gang evidence may be relevant to establish the defendant's motive, intent or some fact concerning the charged offenses other than criminal propensity as long as the probative value of the evidence outweighs its prejudicial effect"].) Though the California Supreme Court has advised that "gang-related evidence 'creates a risk the jury will improperly

10

infer the defendant has a criminal disposition' and that such evidence should therefore 'be carefully scrutinized by trial courts' " (*People v. Mendez* (2019) 7 Cal.5th 680, 691), the evidence is nevertheless admissible when relevant to identity or motive and not substantially outweighed by its prejudicial effect. (*People v. Carter* (2003) 30 Cal.4th 1166, 1194.)

Evidence Code section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." " ' "Prejudice" as contemplated by [Evidence Code] section 352 is not so sweeping as to include any evidence the opponent finds inconvenient. Evidence is not prejudicial, as that term is used in a[n Evidence Code] section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of *undue* prejudice. Unless the dangers of undue prejudice, confusion, or time consumption " 'substantially outweigh' " the probative value of relevant evidence, a[n Evidence Code] section 352 objection should fail. [Citation.] " 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging." ' [Citation.]" [Citation.] [¶] The prejudice that [Evidence Code] section 352 " 'is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.] 'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors. [Citation.]' [Citation.]"

11

[Citation.] In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.' " (*People v. Doolin* (2009) 45 Cal.4th 390, 438-439; accord, *People v. Bell* (2019) 7 Cal.5th 70, 105; *People v. Tran* (2011) 51 Cal.4th 1040, 1048.)

"The trial court enjoys broad discretion in determining the relevance of evidence and in assessing whether concerns of undue prejudice, confusion, or consumption of time substantially outweigh the probative value of particular evidence. [Citation.] 'The exercise of discretion is not grounds for reversal unless[, as set forth previously,] " 'the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*People v. Clark* (2016) 63 Cal.4th 522, 572; accord, *People v. Johnson* (2019) 8 Cal.5th 475, 521; *People v. Jackson* (2016) 1 Cal.5th 269, 320-321.) On appeal, we presume the evidentiary ruling is correct and Price bears the burden of demonstrating error. (*People v. Giordano* (2007) 42 Cal.4th 644, 666; *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1139-1140.)

C. *Analysis*

Price contends the trial court erred by permitting Detective Castillo to testify because the gang evidence was not relevant to any material disputed issue in the case. Recounting his charges, he argues "[t]here were no gang charges or gang allegations. None of the elements of the charged offenses required the prosecutor to prove that appellant was a member of a criminal street gang. . . . The victims in this case were not rival gang members and

12

the prosecutor did not argue that any of the crimes were committed to benefit a gang." Price states the prosecutor "repeatedly emphasized" the gang evidence and their gang " 'mentality' " in her closing argument, characterizing it as saying "in effect, that [he] and Hune were predisposed to commit the instant shooting because of their gang ties." Price asserts there was no direct evidence that he planned with other gang members to retaliate against the guards or that he shared the "mentality" that required retaliation and a disproportionate response. According to Price, there was no evidentiary link between the gang evidence and his offenses. He compares his case to *People v. Memory* (2010) 182 Cal.App.4th 835 and *People v. Albarran*, *supra*, 149 Cal.App.4th 214, in which gang evidence was held inadmissible.

We do not perceive any abuse of discretion. First, the fact this was not a typical gang-on-gang situation, or that the shooting did not occur for the "typical" gang motive, i.e., retaliation against another gang, does not render gang evidence irrelevant. (Accord, *People v. Flores* (2020) 9 Cal.5th 371, 397-402 [gang expert testimony admissible even where no gang enhancement alleged]; *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) Here, the gang evidence was introduced via Detective Castillo, a gang expert, who was qualified to offer opinions on the subject matter of the culture and habits of criminal street gangs, and specifically the Skyline and O'Farrell gangs. (Accord, *Flores*, at p. 398.) *Flores* explained an expert opinion may be rendered in the form of responses to hypothetical questions, as here, which ask the expert to assume the truth of certain facts rooted in the evidence. (*Ibid.*) Here, Detective Castillo's testimony about the gang-related motives for the hypothetical shooting was grounded in evidence: it rested on his knowledge of gang culture, norms and expectations; the fact Price was a

13

member and Mercer an associate of related gangs; and they were out on their gang "holiday." This was combined with other evidence that Price and Mercer were angry about being disrespected and punched by the security guards. The detective was properly permitted to testify about the intent and possible gang-related motives for this kind of shooting, namely that it could be retaliation for how the security guards treated them earlier in the evening. The prosecution was entitled to present its theory of the case based on circumstantial evidence, and introduction of the gang evidence gave the jury context necessary to understand it. (*People v. Franklin, supra,* 248 Cal.App.4th at p. 953; *People v. Pettie* (2017) 16 Cal.App.5th 23, 44 [evidence of defendant's gang membership was probative and properly admitted on motive for defendants to participate in an assault on the boyfriend of the ex-wife of one defendant, where there was no evidence they had any involvement in the incident that caused the victim to call police, triggering the attack]; see *People v. Booker* (2011) 51 Cal.4th 141, 171 ["prosecution may present a persuasive and forceful case"]; *People v. Roberts* (1992) 2 Cal.4th 271, 299 [introduction of gang evidence unconnected to the defendant is not fundamentally unfair where evidence was relevant to prosecutor's theory of the case and provided jury with context necessary to understand it].) The absence of direct evidence that Price and the others were celebrating the gang holiday at the bar is not fatal to the court's ruling when it could be reasonably inferred from Detective Castillo's testimony.

Additionally, as summarized above, the jury was given limiting instructions on the evidence, telling it to consider it only on the issues of Hune's knowledge, the defendants' intent and motive, or the credibility and believability of witnesses. Jurors were specifically instructed not to conclude from it that Price had a "bad character or that he has a disposition to commit

crime." We presume the jury followed these limiting instructions, and Price has not pointed to anything in the record to rebut that presumption. (Accord, *People v. Franklin*, *supra*, 248 Cal.App.4th at p. 953.) Indeed, the record shows the jury carefully considered application of the evidence generally, as evidenced by its inability to reach a verdict as to Price's codefendant Hune.

In part because the jury's use of the gang evidence was expressly limited, we cannot say the trial court abused its discretion when it determined that the probative value of the gang evidence was not substantially outweighed by its prejudicial effect. (Accord, *People v. Flores*, *supra*, 9 Cal.5th at p. 402 [detective's testimony about gang culture— including particularly the importance of recruitment and the significance of disrespect—was highly relevant to defendant's possible motive for the charged crimes and any prejudice "was far outweighed by its probative value" particularly where court limited the scope of testimony to exclude any mention of specific crimes committed by other members of gang]; *People v. Tran*, *supra*, 51 Cal.4th at p. 1047 [to be excluded under Evidence Code section 352, probative value of evidence must be *substantially* outweighed by its prejudicial effect].)[6]

This case is unlike *People v. Albarran*, *supra*, 149 Cal.App.4th 214, in which the court admitted in addition to gang evidence on the defendant's motive and intent, "other extremely inflammatory gang evidence . . . which had no connection to the[ ] crimes." (*Id.*, at p. 227.) Specifically, an officer "testified at length about the identities of other [gang] members, the wide variety of crimes they had committed and the numerous contacts between the

---

[6] Price argues the central disputed issue was his identity, and the gang evidence lacked any evidentiary link to that issue. But identity was not the sole issue in the case, and as we have concluded, the prosecution was entitled to present the evidence on the issues of intent and motive.

15

various gang members (other than [the defendant]) and the police. He described a specific threat [the gang] had made in their graffiti to kill police officers" and there were "references to the Mexican Mafia." (*Id.* at pp. 227-228, fn. omitted.) The Court of Appeal concluded the gang evidence was irrelevant, cumulative, and presented a substantial risk of undue prejudice, in part because the "paramount function of this evidence was to show [the defendant's] criminal disposition." (*Id.* at p. 228.) In this case, the gang evidence pertained to the People's motive theory that Price committed the shooting in retaliation for the security guards' conduct against him and Mercer at the bar. Though Detective Castillo gave some history of the Skyline or O'Farrell gangs including generally the kinds of crimes the gang was involved with over the years, there was no discussion of other unrelated gang members' arrests, identities or specific criminal activities as in *Albarran*, so we cannot say the gang evidence in this case was unduly inflammatory. Further, *Albarran*'s outcome was compelled by the fact there was insufficient evidence to support the contention that a shooting was done with intent to gain respect and enhance the shooter's reputation. (*Id.* at pp. 217, 222, 227.)[7] Here, the People presented evidence of the fact the incident with the security guards occurred the morning after the gang's "holiday,"

[7]     In *Albarran*, the appellate court observed that the motive for the shooting "was not apparent from the circumstances of the crime." (*People v. Albarran*, *supra*, 149 Cal.App.4th at p. 227.) Though the subject of the party at which the shooting occurred was a gang member, that gang did not have known or relevant gang rivalries, there was no evidence the shooters announced their presence, and there was no evidence any gang members had bragged about the crime or took credit for it. (*Ibid*.) "In the final analysis, the only evidence to support the respect motive is the fact of Albarran's gang affiliation." (*Ibid*.) The court concluded that the introduction of the inflammatory gang evidence having nothing to do with the issues, and allowing no permissible inferences, violated the defendant's due process rights and rendered his trial fundamentally unfair. (*Id.* at pp. 229-230.)

which would enhance the disrespect in getting roughed up and expelled by the security guards. That evidence reasonably permitted an inference of a retaliatory motive for the shooting. This case does not present the "rare and unusual occasion[ ]"—as in *Albarran*—where the admission of gang-related evidence resulted in fundamental unfairness to the defendant.

It is also unlike *People v. Memory*, *supra*, 182 Cal.App.4th 835. In *Memory,* the defendants were charged with various crimes after stabbing others during a bar fight. (*Id*. at pp. 837-838.) There, after holding an Evidence Code section 402 hearing, the court *excluded* the testimony of an expert about a motorcycle gang called the Jus Brothers, of which the defendants were members, in part finding his opinion that it was a criminal enterprise was unsupported. (*Id*. at pp. 837, 848-852.) But the prosecutor in opening statements repeatedly referred to the gang as an "outlaw motorcycle group" and a "one-percent club," indicting it meant the men were "warrior[s]." (*Id*. at pp. 852, 861.) He also told the jury that a one-percenter had to support the Hell's Angels and many of them wore a Hell's Angel's support patch. (*Id*. at p. 853.) Though the Court of Appeal observed that gang evidence could be relevant to identity and motive, identity was not disputed, and in the absence of the expert's testimony, there was no foundation for a conclusion that the defendants were conforming to club practices. (*Id*. at p. 858.) The court held the gang evidence—evidence of the gang's culture and organization, the concept of one-percenters and warrior spirit, the support for Hell's Angels and criminal activity by certain members—lacked foundation, was inflammatory, and was improperly admitted via the prosecutor on the defendants' criminal disposition or character *as if the expert had testified*. (*Id*. at pp. 838, 858 ["Where the People were unable to introduce evidence on these topics because none of the Jus Brothers called as witnesses testified as

17

the expert had, the trial court nevertheless allowed the prosecutor to argue and insinuate as if such evidence had been admitted.  The effect was to admit the expert's opinion on these aspects of the Jus Brothers without actual testimony"], 860 ["The trial court recognized the lack of evidence regarding the criminal nature of the Jus Brothers and properly excluded expert opinion that the Jus Brothers was a criminal gang.  The court also excluded expert testimony as to other aspects of the club, finding it too prejudicial, particularly as to credibility.  The prosecutor was allowed, nonetheless, to attempt to introduce '[p]retty much everything [the expert] testified to' through other witnesses and argue the Jus Brothers' and defendants' criminal disposition"].)

Here, there is no question Detective Castillo was qualified and testified about the Skyline and O'Farrell gangs, and thus the People presented foundation for his conclusions concerning the nature and importance of disrespect, and the gang-related motive for the shooting.  Importantly, in *Memory* the court acknowledged that "with an appropriate foundation and limitations, testimony regarding the beliefs and practices of an organization may be relevant to explain the conduct of a member on a particular occasion." (*People v. Memory*, *supra*, 182 Cal.App.4th at p. 862.)  Such is the case here.  Nor did Detective Castillo bring in inflammatory evidence concerning other unrelated violent street gangs, as the prosecutor did in *Memory* with references to the Hell's Angels.  We see no indication Detective Castillo's testimony was used by the prosecutor to suggest Price was generally predisposed to commit crimes, as opposed to explaining his motivation for retaliating against the guards.  In sum, we are not persuaded the court's decision to allow the gang evidence was so " ' " 'arbitrary, capricious or

18

patently absurd . . . that [it] resulted in a manifest miscarriage of justice.' " ' " (*People v. Montes* (2014) 58 Cal.4th 809, 869.)

Price nevertheless maintains the admission of the evidence was erroneous and deprived him of a fair trial, since it had no bearing on his identity, which he asserts was the "central disputed issue" in the case. Even where gang evidence is improperly admitted, the error does not necessarily deprive a defendant of the right to due process, or constitute prejudicial error. " 'To prove a deprivation of federal due process rights, [a defendant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial.' [Citation.] ' "The dispositive issue is . . . whether the trial court committed an error which rendered the trial 'so "arbitrary and fundamentally unfair" that it violated federal due process.' " ' " (*People v. Covarrubias* (2011) 202 Cal.App.4th 1, 20; see also *People v. Merriman* (2014) 60 Cal.4th 1, 70.) " 'Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' " (*People v. Hunt* (2011) 196 Cal.App.4th 811, 817.) The gang-related evidence here allowed the jury to draw inferences as to Price's motive and intent, and thus does not meet this standard.

II. *Admission of Detective's Opinion on Identity From Surveillance Videos*

Price contends the admission of Detective Tafoya's testimony identifying Price as the shooter based on surveillance video violated his state and federal constitutional rights to a fair trial. He first argues that the investigating detective's testimony could not be admitted as expert testimony; it was based entirely on what the detective saw in the surveillance

19

videos and was thus not related to a subject sufficiently beyond common experience so as to assist the trier of fact or based on his specialized knowledge, skill or training, but rather it consisted of inferences and conclusions that the jury could have drawn as easily as him. The People did not present Detective Tafoya as an expert, so this argument fails on that ground.

Price further contends the testimony was inadmissible as lay testimony because (1) oral testimony is inadmissible to prove the content of a video; (2) the detective's opinion was not based on his personal knowledge; and (3) the opinion invaded the province of the jury on identity, and constituted an inadmissible opinion on the issue of his guilt.

The People respond that such lay testimony is common. They point out the jurors saw the video themselves and were instructed they alone were to decide the facts. They also point out that the jury was instructed with CALCRIM No. 333, in part telling it they "may but are not required to accept those opinions as true or correct" and "may give the opinions whatever weight you think appropriate." The People argue the detective's testimony had sufficient foundation, did not invade the jury's province, and any error was harmless in any event in view of the instruction, arguments and opportunity for cross-examination, as well as the jurors' ability to reach their own conclusions.

Though Price forfeited the issue given his counsel's failure to object (see Evid. Code, § 353 [party may not complain on appeal that evidence is inadmissible absent a timely and specific objection on that ground below]), we nevertheless reach it in view of his ineffective assistance of counsel claim. We review the court's decision for abuse of discretion. (*People v. Leon* (2015) 61 Cal.4th 569, 600.)

Doing so, we perceive no error.  A lay person may properly offer an opinion on the identity of a person—including from surveillance footage—if it is rationally based on the witness's perception, helpful to a clear understanding of the witness's testimony, and not more prejudicial than probative.  (*People v. Leon*, *supra*, 61 Cal.4th at p. 601, in part quoting *People v. Perry* (1976) 60 Cal.App.3d 608, 612 [proper for officers to identify defendants in surveillance footage or photographs where they had contacts with the defendant, were aware of his physical characteristics on the day of the offense, and predicated their identification on their perception of film taken of the events]; *People v. Mixon* (1982) 129 Cal.App.3d 118, 130-131 [upholding admission of officers' lay opinion identifying the defendant from surveillance photos where officers had requisite personal knowledge having previously seen the defendant on numerous occasions and one familiarized himself with defendant's features; the testimony aided the jury because the photos were not a clear depiction of the subject; and officers did not depict the defendant as being under police scrutiny such that prejudice did not outweigh probative value]; see also *People v. Ingle* (1986) 178 Cal.App.3d 505, 513 [admission of such lay identification testimony is "clearly established"].)  Admission of such testimony is proper even when the familiarity occurs after the crimes (accord, *People v. Leon*, at p. 600) and even where the witness only becomes familiar with the defendant's appearance from photographs, not personal contact.  (*People v. Larkins* (2011) 199 Cal.App.4th 1059, 1065-1068 [loss prevention manager of gym who saw defendant's picture from driver's license and booking photo could properly identify him in videos from other clubs; "It does not matter at what point in his viewing of the videos—either before, during or after—that he saw what were indisputably photos of defendant, and then could put a name to the images he saw"].)

The trial court did not abuse its discretion in permitting Detective Tafoya's testimony because it meets these foundational requirements. The detective was aware of Price's appearance via still photographs from the bar surveillance video that same evening and morning, then reviewed the local business surveillance video of the shooting to render his opinion that it was Price in the latter video exiting the car. Because Detective Tafoya was familiar with Price's appearance on the evening/morning in question, and the surveillance video of the shooting did not clearly depict the man exiting the car, his testimony aided the jury in determining the critical issue of his identity, and was therefore admissible. (See *People v. Leon, supra*, 61 Cal.4th at p. 600; *People v. Mixon, supra*, 129 Cal.App.3d at p. 128.)

We disagree with Price's argument that the detective's testimony that Price was the person exiting the Chrysler 300 amounted to an impermissible opinion on his guilt. The detective did not say Price was guilty, or that he was the shooter, or offer any opinion on the ultimate fact of Price's guilt. (Compare *People v. Brown* (1981) 116 Cal.App.3d 820, 829 [officer's testimony that the defendant "was working as a runner"—given jury instructions defining a runner—was tantamount to an opinion that the defendant was guilty of the charged crime]; *People v. Torres* (1995) 33 Cal.App.4th 37, 48 [officer's volunteered opinion that robbery "is what happened in this particular case" was an improper opinion on what crimes were committed and whether defendant was guilty of them].) Were we to hold otherwise, courts could never admit into evidence any lay opinion identifying a person based on a photograph or video of that person in the act of a crime.

Nor was Detective Tafoya's testimony admitted to prove the content of the video, as Price asserts. In the case he relies on, *People v. Panah* (2005) 35 Cal.4th 395, the court explained a video is a writing for the purposes of the

22

best evidence rule, but "[t]he purpose of the best evidence rule is 'to minimize the possibilities of misinterpretation of writings by requiring the production of the original writings themselves, if available.' " (*Id*. at p. 475.) The video at issue here was admitted into evidence, and Detective Tafoya's testimony was not used to prove the video's content, but rather to assist the jury in identifying the individual seen exiting the vehicle before the shooting. Courts have upheld the admission of police officers' testimony identifying defendants in surveillance footage without best evidence concerns. (See *People v. Leon*, *supra*, 61 Cal.4th at p. 601.)

### III. *A.T.'s Testimony*

At trial, the People called A.T., one of the security guards present during the shooting. A.T. was working at the bar and observed the aftermath of the fight and Price and his group's exit. However he was unable to identify Price as one of the men involved in the fight. Afterwards, outside the jury's presence, the prosecutor asked A.T. if he had messaged an investigator about his belief that the defendants were from Skyline or O'Farrell, and he explained the investigator had told him the defendants were from those gangs and if anything happened, they could do witness protection. Afterwards, the prosecutor asked the court to pursue that issue before the jury as going to A.T.'s "state of mind as to why he is being hesitant to identify anyone." Hune's counsel responded: "If she goes into it, then I think we can go into how he received that information." The court said, "Well, of course," and he replied, "No problem."

The prosecutor thereafter asked A.T. whether he was reluctant to call the investigator back, and he confirmed he "didn't want to be involved." She asked: "Do you have any concerns for your personal safety coming to court to testify?" A.T. responded: "Well, I mean, [the investigator] had mentioned

23

that the guys were possibly gang members and . . . the paperwork alone says you are reporting to the gang part of the court, and then—the gang prosecution part, you know. So that's a little, you know, odd, makes you not want to really show up. And then he also said, you know, we are not worried about it but we can offer witness protection and things if it seems like something might happen. So once people start saying those kind of things, yeah, it does make you concerned. I have kids that are with me all the time."

Price contends his due process right to a fair trial was violated when the prosecutor elicited this testimony from A.T. He maintains there was no evidence A.T. was threatened by either defendant, or that the witness was in danger of retaliation. He argues the prosecutor's questions implied he and Hune were dangerous individuals with a propensity for violence, and it was particularly prejudicial given her argument that their gang mentality required them to retaliate against anyone who disrespected or harmed them. Price argues the questions were irrelevant and designed only to prejudice the jury against them.

We reject the contention. First, Price's counsel forfeited it by failing to object. (Accord, *People v. Flinner* (2020) 10 Cal.5th 686, 719; *People v. Mora and Rangel* (2018) 5 Cal.5th 442, 502.) Even if that were not the case, the court did not abuse its discretion in permitting the prosecutor's questions. Because A.T. did not identify Price as one of the men involved in the fight, admission of his knowledge and concern about the fact the defendants were gang members was probative to explain his reluctance or fear in testifying against them, and the credibility of his testimony in that respect. (See *People v. Pettie*, *supra*, 16 Cal.App.5th at p. 44 [where victim and other prosecution witnesses testified they could not recall details of assault, and victim admitted he had been "living watching over my shoulder" and expressed

concerned for the well-being of his family, evidence of defendants' gang involvement was probative to explain why the witness might be reluctant or afraid to testify against defendants]; see also *People v. Harris* (1985) 175 Cal.App.3d 944, 957 [evidence of gang membership was relevant to witness's credibility where witness failed to respond to questions or refused to answer, and had earlier told a detective he was afraid to testify because the defendants would shoot up his mother's house if he did].)  The probative value of A.T.'s testimony in this regard was not affected by the absence of evidence A.T. was threatened or in actual danger, as long as it is reasonable to infer A.T.'s hesitance or inability to identify Price may be impacted by his knowledge of defendants' gang status.

## IV. *Claim of Ineffective Assistance of Counsel*

Price contends that as to any claims his counsel forfeited concerning A.T.'s or Detective Tafoya's testimony, he received constitutionally ineffective assistance, requiring reversal.  The People respond that he has not established his counsel was ineffective in part because the evidence was admissible, and therefore defense counsel was not ineffective in foregoing any objection to it.

Again we agree with the People.  To succeed on such a claim, Price must show his counsel's "omission 'fell below an objective standard of reasonableness' [citations] in light of 'the professional norms prevailing when the representation took place' [citations]." (*In re Long* (2020) 10 Cal.5th 764, 773.)  This court indulges " 'a "strong presumption" that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight.' " . . . [W]e must 'reconstruct the circumstances of counsel's challenged conduct, and . . . evaluate the

conduct from counsel's perspective at the time.' " (*In re Long*, at p. 774.) Price must overcome the presumption that under the circumstances, counsel's " 'challenged action "might be considered sound trial strategy." ' " (*In re Gay* (2020) 8 Cal.5th 1059, 1073.) He cannot make the requisite showing or overcome the presumption, because counsel cannot be faulted for failing to make unmeritorious or futile objections. (*People v. Maury* (2003) 30 Cal.4th 342, 419.)

## V. *Imposition of Fines, Fees and Assessments*

The trial court ordered Price to pay a $10,000 restitution fine (§ 1202.4, subd, (b)), stayed a section 1202.45 restitution fine in the same amount, and imposed a court operations fee in the amount of $280 (§ 1465.8), a criminal justice administration fee of $154 (Gov. Code, § 29550.1), and a criminal conviction assessment of $210 (Gov. Code, § 70373). Price's counsel did not object based on Price's ability to pay.

Price contends the court's imposition of assessments, fees and fines without considering his ability to pay them violated his due process rights under the federal and state constitutions and *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).[8] He maintains the record does not support an inference he had or would have in the future any ability to pay them; nothing

---

[8] Cases have held that *Dueñas* was wrongly decided; that restitution fines should be reviewed not under due process principles but under the Eighth Amendment's excessive fines clause, as this court held in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted November 13, 2019, S257844. The California Supreme Court will resolve two issues in *Kopp*: "(1) Must a court consider a defendant's ability to pay before imposing or executing fines, fees, and assessments? [and] (2) If so, which party bears the burden of proof regarding defendant's inability to pay?" Because we conclude any error was harmless, we need not address the areas of disagreement with *Dueñas* by this and other courts. (See, e.g., *People v. Allen* (2019) 41 Cal.App.5th 312, 318, 326-327; *People v. Hicks* (2019) 40 Cal.App.5th 320, review granted Nov. 26, 2019, S258946.)

shows he is anything other than indigent now that he has been sentenced to multiple potential life prison terms. He also argues imposition of the fines, fees and assessments violated his Eighth Amendment protection against excessive fines.

Pointing out Price's counsel raised no objection on any of these grounds, and that trial courts can consider a defendant's ability to pay a restitution fine above the statutory maximum as here, the People respond that Price forfeited his appellate challenge. They further argue that even if that were not the case, imposition of the restitution fine did not violate Price's constitutional rights. The People finally argue that to the extent imposition of the non-punitive assessments implicates due process concerns, any due process violation is harmless beyond a reasonable doubt even with a minimum prison wage, given Price's young age, employment history and the length of time he will serve.

We agree Price forfeited his due process and excessive fines arguments given his counsel's failure to object on those specific grounds, or on his client's alleged inability to pay. (See, e.g., *People v. Oliver* (2020) 54 Cal.App.5th 1084, 1102; *People v. Smith* (2020) 46 Cal.App.5th 375, 395-396; *People v. Keene* (2019) 43 Cal.App.5th 861, 863-864; *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033.) Because the court imposed a restitution fine greater than the statutory minimum, Price had every incentive to assert an inability-to-pay objection. (*Oliver*, at p. 1102; *Smith*, at p. 395 ["It is well established that a defendant forfeits a challenge to the trial court's imposition of a restitution fine above the statutory minimum for failing to consider his or her ability to pay if the defendant did not object in the trial court"].) Price's ability to pay is a fact specific inquiry that must be raised below to preserve it on appeal. (See *People v. Baker* (2018) 20 Cal.App.5th

711, 720 [claims requiring a fact specific inquiry are forfeited if not raised below].)

As the People argue, we agree any assumed error was harmless beyond a reasonable doubt given future wages Price may earn in prison. (*People v. Jones* (2019) 36 Cal.App.5th 1028, 1035 [*Dueñas* error subject to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18]; *People v. Johnson* (2019) 35 Cal.App.5th 134, 139-140 [same]; see *People v. Jenkins* (2019) 40 Cal.App.5th 30, 41, review granted Oct. 23, 2019, S258729, review dismissed and cause remanded July 29, 2020 [court may consider wages defendant may earn in prison on his ability to pay fines and assessments]; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1076 [court may consider defendant's future ability to pay]; *People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837; § 2085.5 [outlining how a restitution fine balance may be collected from prison wages].) At the time of his sentencing in September 2019, Price was 28 years old. He previously worked in construction and warehousing, and was employed as a framer in the months before his arrest, earning approximately $500 per week.

"[E]very able-bodied" prisoner must work while imprisoned. (§ 2700.) "Wages in California prisons currently range from $12 to $56 a month." (*People v. Jones*, *supra*, 36 Cal.App.5th at p. 1035, citing in part Cal. Code Regs., tit. 15, § 3041.2, subd. (a)(1).) " 'The state may garnish between 20 and 50 percent of those wages to pay the section 1202.4, subdivision (b) restitution fine.' " (*People v. Lowery* (2020) 43 Cal.App.5th 1046, 1060; see also *Jones*, at p. 1035, citing § 2085.5, subd. (a) & Cal. Code Regs., tit. 15, § 3097, subd. (f).) While Price's fees, assessments and fines are substantial and it may take some time for him to pay this amount, that circumstance does not support his inability to make payments on these amounts from

prison wages.  (*People v. Aviles*, *supra*, 39 Cal.App.5th at p. 1077.)  Nothing in the record suggests Price is unable to work a prison job; rather, given his past work history, inferences may be drawn to the contrary.  "In our view, this forecloses a meritorious inability to pay argument."  (*Jones*, at p. 1035.)  Though Price maintains the record is insufficient to make this finding, we disagree, and the length of time he faces in prison belies this argument.  "It is illogical to conclude that [Price] will not have an ability to begin paying at least some of the imposed fees, fines and assessments while [he] is incarcerated."  (*Lowery*, at p. 1061.)

VI.  *Correction of Abstract of Judgment*

The trial court imposed at Price's sentencing, and Price's abstract of judgment indicates, sentences of "seven years to life" for his attempted murder convictions in counts 1 through 3.  Price argues these sentences are unauthorized; that the correct sentence on those counts is life with the possibility of parole.  (§ 664, subd. (a).)  The People concede the abstract of judgment should be corrected.  We agree with that concession, and direct the trial court to correct the abstract of judgment accordingly.

DISPOSITION

The matter is remanded with directions that the trial court correct the abstract of judgment to reflect that Price's sentence on counts 1, 2 and 3 is life with the possibility of parole, and forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation. In all other respects the judgment is affirmed.

O'ROURKE, J.

WE CONCUR:


BENKE, Acting P. J.


HALLER, J.

30